JUDGE KATHLEEN CARDONE

### IN THE UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | |
|---|---|
| JOSHUA CACHO, a Florida resident,<br><br>**Plaintiff,**<br><br>v.<br><br>**MCCARTHY & KELLY LLP**, A New York<br>Limited Liability Partnership<br><br><br><br>**Defendant.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

**EP23CV0298**

### PLAINTIFF'S ORIGINAL COMPLAINT

### PARTIES

1.      Plaintiff JOSHUA CACHO ("Plaintiff") a natural person, resident of the Western District of Texas, and was present in Texas for the last two calls in this Complaint, in this case in El Paso County, Texas.

2.      Defendant MCCARTHY & KELLY LLP ("MKLLP") is a Limited Liability Company organized and existing under the laws of New York and can be served via registered agent and partner Gerald T. McCarthy, Esq. at 52 Duane St, 7th Floor New York, New York, 10007, United States.

3.      John Does 1-35 are overseas telemarketers Defendant MKLLP hired anonymously to solicit injury claim services for Camp Lejeune victims at their behest. John Does 1-35 are out of reach and jurisdiction of the laws of the United States.

1

## JURISDICTION AND VENUE

**4.**     Jurisdiction. This Court has federal-question subject matter jurisdiction over Plaintiff's

TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims v. Arrow*

*Fin. Servs., LLC*, 565 U.S. 368, 372 (2012).

## PERSONAL JURISDICTION

**5.**     This Court has specific personal jurisdiction over Defendant because they have

repeatedly placed calls to Texas residents and derived revenue from Texas residents, and they sell

goods and services to Texas residents, including Plaintiff.

**6.**     This Court has supplemental subject matter jurisdiction over Plaintiff's claims arising

under Florida Statutes § 501.059 and § 501.601 and because the claims arise from the same

nucleus of operative fact, i.e., Defendant's telemarketing interactive prerecorded robotic message

calls to Plaintiff and adds little complexity to the case.

## VENUE

**7.**     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a

substantial part of the events giving rise to the claims—the automated robocalls and sale of

goods and services directed at Texas residents, including the Plaintiff—occurred in this District

and because the Plaintiff resides in this District.

**8.**     This Court has venue over Defendant MKLLP because the automated robocalls at issue

were sent by or on behalf of the above-named Defendant to Plaintiff, a Texas resident.

## THE TELEPHONE CONSUMER PROTECTION ACT

## OF 1991, 47 U.S.C. § 227

**9.**     In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing

equipment that could target millions of consumers *en masse*. Congress found that these calls

were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally. *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

**10.**     The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

**11.**     The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

**12.**     The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

**13.**     Separately, the TCPA bans telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

**14.**     The TCPA provides a private cause of action to persons who receive calls in violation of 227(c) or a regulation promulgated there under. 47 U.S.C. § 227(c)(5).

**15.**     According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

---

[1]*See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

**16.** The FCC also recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

**17.** The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines. In particular:[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

**18.** *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

**19.** The FCC confirmed this principle in 2013, when it explained that "a seller ... may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

**20.** Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 – 52 (9th Cir. 2009).

4

**21.** The TCPA defines an ATDS as "equipment which has the capacity – (A) to store or produce telephone numbers to be called, using a random or sequential umber generator; and (B) to dial such numbers. *Id.* at § 227(a)(1)

**22.** As to what type of dialing equipment constitutes an ATDS, the TCPA vests to the Federal Communication Commission ("FCC") the responsibility to promulgate regulations implementing the TCPA's requirements. *Id.* at § 227(a)(1).

**23.** Over the last nineteen years, the FCC has repeatedly recognized that a predictive dialer is an ATDS that is subject to regulation by the TCPA. In its 2003 Order, the FCC also defined a "predictive dialer" holding:

[A] predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers. As commenters point out, in most cases, telemarketers program the numbers to be called into the equipment, and the dialer calls them at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call.[1]

**24.** In 2008, the FCC affirmed "that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers."[2]

**25.** A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *E.g.*, *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist. LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (internal

quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

## FLORIDA STATUTES § 501.059

26.     Florida Statutes § 501.059 makes it a violation to "make or knowingly allow a telephone sales call to be made if such call involves an automated system for the selection or dialing of telephone numbers or the playing of a recorded message when a connection to a number called without the prior express written consent of the called party." Fla. Stat. § 501.059(8)(a).

27.     A "telephone sales call" is defined as a 'telephone call, text message, voicemail transmission to a consumer for the purpose of soliciting a sale of any consumer goods or services, soliciting an extension of credit for consumer goods or services, or obtaining information that will or may be used for the direct solicitation of a sale of consumer goods or services or an extension of credit for such purposes." Fla. Stat. § 501.059(j).

28.     "Prior express written consent" means an agreement in writing that: Fla. Stat. § 501.0059(g).

> 1. Bears the signature of the called party;
>
> 2. Clearly authorizes the person making or allowing the placement of a telephonic sales calls by telephone call, text message, or voicemail transmission to deliver or cause to be delivered to the called party a telephone sales call using an automated system for the selection or dialing of telephone numbers, the playing of a recorded message when a connection is completed to a number called, or the transmission of a prerecorded voicemail;
>
> 3. Includes the telephone number to which the signatory authorizes a telephonic sales

call to be delivered; and

4. Includes a clear and conspicuous disclosure informing the called party that;

   a. By executing the agreement, the called party authorizes the person making or allowing the placement of a telephonic sales call to deliver or cause to be delivered a telephonic sales call to the called party using an automated system for the selection or dialing of telephone numbers or playing of a recorded message when a connection is completed to a number called; and

   b. He or she is not required to directly or indirectly sign the written agreement or to agree to enter into such agreement as a condition of purchasing any property, goods, or services.

**29.**     A person aggrieved by a violation of this section may bring an action to recover actual damages or $500, whichever is greater.  Fla. Stat. § 501.059(10)(a)(2).

**30.**     If the court finds that the Defendant's willfully or knowingly violated this section or rules adopted pursuant to this section, the court may, in its discretion, increase the amount of the award to an amount equal to not more than three times the amount available under paragraph (a). Fla. Stat. § 501.059(10)(a)(2)(b).

## FLORIDA TELEMARKETING ACT

**31.**     A commercial telephone seller or salesperson making a commercial telephone solicitation call may not use technology that deliberately displays a different caller identification number than the number the call is originating from to conceal the true identity of the caller.  Fla. Stat. § 501.616(7)(b).

**32.**     A commercial telephone seller or salesperson may not transmit more than three commercial telephone solicitation phone calls from any number to a person over a 24-hour

7

period on the same subject matter or issue, regardless of the phone number used to make the call. Fla. Stat. § 501.616(6)(b).

**33.** In addition to any other penalties or remedies provided under law, a person who is injured by a violation of the provisions of this part may bring a civil action for recovery of actual damages and/or punitive damages, including costs, court costs, and attorney's fees. No provision of this part shall be construed to limit any right or remedy provided under law. Fla. Stat. § 501.625.

### The Texas Business and Commerce Code § 302.101

**34.** The Texas Business and Commerce code requires sellers to obtain a registration certificate from the secretary of State in Order to make telephone solicitations inside the state of Texas or to residents located in Texas.

**35.** The Plaintiff may seek damages of violations of Texas Business and Commerce Code § 302.101 of to $5,000.00 per violation, reasonable costs of prosecuting the action, court costs investigation costs, depositions expenses, witness fees, and attorney's fees.

**36.** Texas Business and Commerce code § 302.101 provides a private right of action. A violation of Chapter 302 "is a false, misleading or deceptive act of practice under Subchapter E, Chapter 17" and is enforceable as such: "A public or private right of remedy prescribed by Subchapter E, Chapter 17, may be used to enforce [Chapter 302." Tex. Bus. & Com. Code § 302.303.

**37.** The use or employment by any person of a false, misleading, or deceptive act or practice causes "economic damages or damages for mental anguish." Tex. Bus. & Com. Code § 17.50

### FACTUAL ALLEGATIONS

**38.** Plaintiff's personal cell phone ending in 3881 has been registered on the National Do-

8

Not-Call Registry for more than thirty-one (31) days prior to the first call received from Defendant MKLLP's telemarketers.

**39.**     Plaintiff personally registered the cell phone at issue in this case on the National-Do-Not-Call Registry.

**40.**     Plaintiff never asked the National Do-Not-Call Registry administrator to remove him from the National Do-Not-Call Registry and Plaintiff was on the National Do-Not-Call Registry at all times relevant to this Complaint.

**41.**     Plaintiff was residing in Florida from beginning of time up until July 16, 2023, in which he has been residing in Texas.

**42.**     Defendant MKLLP operates as a tort claim law firm.

**43.**     MKLLP hired anonymous telemarketers to place telephone solicitation phone calls because MKLLP is barred by ethics from directly placing unsolicited phone calls on their own behalf.

**44.**     Defendant MKLLP called Plaintiff at least thirty-five (35) times. All calls were unauthorized sales calls soliciting "injury claims" for "Camp Lejeune victims".

**45.**     Upon information and belief Defendant MKLLP's overseas anonymous telemarketers Plaintiff more times over the last four (4) years that he is currently unaware of without the benefit of Discovery.

**46.**     Upon information and belief Defendant MKLLP used other marketing agencies to contact Plaintiff over the last four (4) years that Plaintiff is unaware of at this time without the benefit of Discovery.

**47.**     **Call #1, DNC Request #1,** *See Table A,* On June 01, 2023, at 2:50 PM Plaintiff received a call from 407-634-3965 asking if Plaintiff or any family member had been to Camp Lejeune

9

from 1953 – 1987 and suffered any disease "like cancer".

**48.**     Plaintiff told the representative who had a heavy "Middle Eastern" accent that he was on the DNC list and to not call back again.

**49.**     **Calls #2-34**, **DNC Requests #2-34**, *See Table A*, Plaintiff received at least thirty-three (33) calls all beginning the same way as **Call #1**, *See paragraph 38*, (asking if Plaintiff or any family member had been to Camp Lejeune from 1953 – 1987 and suffered any disease "like cancer"), and on each, and every call Plaintiff would inform the overseas telemarketer to stop calling and would immediately disconnect the line.

**50.**     Plaintiff believes the telemarketers to reside overseas due to their heavy "Middle Eastern" accents and the loud foreign "Arabic" sounding language overheard in the background of each call.

**51.**     At no time did Defendant's telemarketers honor the numerous DNC Requests Plaintiff had made.

**52.**     **Call #35**, *See Table A*, on July 25, 2023, at 9:29 AM, (Mountain Time) Plaintiff received a call from 206-279-5657. After hearing that the call was about "Camp Lejeune" and began the same way all previous Thirty-four calls had begun, *See Paragraphs 47-50*, Plaintiff engaged the telemarketer for the sole purpose of identifying the responsible party(s) for each of the calls.

**53.**     Plaintiff used the pseudo name Alex Rivera, and after speaking to an overseas telemarketer by the name of "Justin" he was eventually live transferred to William Kelly, who identified himself as "Bill Kelly, Partner of McCarthy & Kelly LLP".

**54.**     William sent Plaintiff a series of emails while on the call from email address bk@mccarthykelly.com. *See Exhibit A.*

**55.**     Later that day Plaintiff received an email containing the contract agreement for

Defendant MKLLP and Plaintiff. *See Exhibit B.*

56.    On July 29, 2023, Plaintiff received an email from Defendant containing more documents even after Plaintiff had already notified Defendant MKLLP on July 25, 2023, that he was not interested. *See Exhibit C.*

57.    Table A below displays the calls received from Defendant MKLLP.

**Table A**

| NO. | Date | Time | Caller ID | Notes |
|-----|------|------|-----------|-------|
| 1 | Jun 01, 2023 | 2:50 PM | (407) 634-3965 | John - Camp Lejeune, told them I'm on the DNC list and to not call back DNC Request #1 |
| 2 | Jun 01, 2023 | 3:10 PM | (641) 458-4508 | Shawn White - Camp Lejeune - told them stop calling - DNC Request #2 |
| 3 | Jun 02, 2023 | 4:46 PM | (407) 481-1609 | Josh - Camp Lejeune - told them stop calling - DNC Request #3 |
| 4 | Jun 05, 2023 | 4:44 PM | (407) 577-9726 | Eric - Camp Lejeune - told them stop calling - DNC Request #4 |
| 5 | Jun 05, 2023 | 4:59 PM | (407) 329-8469 | Shane - Camp Lejeune - told them stop calling - DNC Request #5 |
| 6 | Jun 06, 2023 | 4:43 PM | (636) 329-7242 | Daniel Cooper - Camp Lejeune - told them stop calling - DNC Request #6 |
| 7 | Jun 07, 2023 | 2:10 PM | (407) 571-0273 | Mike Wilson - Camp Lejeune - told them stop calling - DNC Request #7 |
| 8 | Jun 07, 2023 | 6:25 PM | (785) 390-9888 | Roman - Camp Lejeune - told them stop calling - DNC Request #8 |
| 9 | Jun 08, 2023 | 5:12 PM | (407) 577-1841 | Ron - Camp Lejeune - told them stop calling - DNC Request #9 |
| 10 | Jun 13, 2023 | 6:03 PM | (352) 352-4798 | Jonathan - Camp Lejeune - told them stop calling - DNC Request #10 |
| 11 | Jun 13, 2023 | 6:16 PM | (857) 226-0314 | David - Camp Lejeune - told them stop calling - DNC Request #11 |

| NO. | Date | Time | Caller ID | Notes |
|---|---|---|---|---|
| 12 | Jun 14, 2023 | 12:32 PM | (239) 396-7469 | James - Camp Lejeune - told them stop calling - DNC Request #12 |
| 13 | Jun 19, 2023 | 11:13 AM | (205) 544-2332 | Shawn White - Camp Lejeune - told them stop calling - DNC Request #13 |
| 14 | Jun 20, 2023 | 4:11 PM | (352) 290-3072 | Alex Connor - Camp Lejeune - told them stop calling - DNC Request #14 |
| 15 | Jun 20, 2023 | 4:12 PM | (352) 290-3535 | Michael - Camp Lejeune - told them stop calling - DNC Request #15 |
| 16 | Jun 20, 2023 | 7:09 PM | (302) 209-7625 | David - Camp Lejeune - told them stop calling - DNC Request #16 |
| 17 | Jun 22, 2023 | 2:27 PM | (531) 201-3133 | Jason - Camp Lejeune - told them stop calling - DNC Request #17 |
| 18 | Jun 22, 2023 | 4:42 PM | (770) 762-8186 | David - Camp Lejeune - told them stop calling - DNC Request #18 |
| 19 | Jun 26, 2023 | 2:58 PM | (580) 289-5177 | Max - Camp Lejeune - told them stop calling - DNC Request #19 |
| 20 | Jun 27, 2023 | 2:18 PM | (612) 295-0897 | David Brown - Camp Lejeune - told them stop calling - DNC Request #20 |
| 21 | Jul 05, 2023 | 4:41 PM | (919) 764-1474 | Zach - Camp Lejeune - told them stop calling - DNC Request #21 |
| 22 | Jul 07, 2023 | 11:29 AM | (772) 617-0221 | Shawn White - Camp Lejeune - told them stop calling - DNC Request #22 |
| 23 | Jul 07, 2023 | 1:13 PM | (407) 775-2916 | Mark - Camp Lejeune - told them stop calling - DNC Request #23 |
| 24 | Jul 07, 2023 | 1:51 PM | (321) 379-8886 | Michael - Camp Lejeune - told them stop calling - DNC Request #24 |
| 25 | Jul 10, 2023 | 12:39 PM | (561) 216-0452 | Sam - Camp Lejeune - told them stop calling - DNC Request #25 |
| 26 | Jul 10, 2023 | 4:54 PM | (352) 290-3535 | Jason - Camp Lejeune - told them stop calling - DNC Request #26 |
| 27 | Jul 10, 2023 | 5:07 PM | (839) 209-8809 | David - Camp Lejeune - told them stop |

| NO. | Date | Time | Caller ID | Notes |
|-----|------|------|-----------|-------|
|  |  |  |  | calling - DNC Request #27 |
| 28 | Jul 11, 2023 | 4:44 PM | (208) 563-2901 | David - Camp Lejeune - told them stop calling - DNC Request #28 |
| 29 | Jul 14, 2023 | 5:30 PM | (541) 692-7961 | Jason - Camp Lejeune - told them stop calling - DNC Request #29 |
| 30 | Jul 15, 2023 | 4:22 PM | (808) 458-1618 | Steve - Camp Lejeune - told them stop calling - DNC Request #30 |
| 31 | Jul 15, 2023 | 5:08 PM | (801) 692-7008 | Shawn - Camp Lejeune - told them stop calling - DNC Request #31 |
| 32 | Jul 15, 2023 | 5:20 PM | (505) 533-2984 | Steve - Camp Lejeune - told them stop calling - DNC Request #32 |
| 33 | Jul 15, 2023 | 5:33 PM | (304) 500-8073 | John - Camp Lejeune - told them stop calling - DNC Request #33 |
| 34 | Jul 20, 2023 | 10:23 AM (MT) | (407) 577-9355 | Jennifer - Camp Lejeune - told them stop calling - DNC Request #34 |
| 35 | Jul 25, 2023 | 9:29 AM (MT) | (206) 279-5657 | Justin - Camp Lejeune, transferred to Bill Kelly got documents |

58.     Plaintiff did not have an established business relationship with Defendant

MKLLP, nor did Plaintiff consent to the calls sent to his personal phone.

59.     Plaintiff did not provide his phone number to Defendant MKLLP or their

telemarketers at any point.

60.     Plaintiff sent an internal do-not-call policy request to Defendant MKLLP to

email bk@mccarthykelly.com on July 25, 2023.

61.     Despite this request for their internal DNC policy, Defendant MKLLP failed

and/or refused to send Plaintiff a Do- Not-Call policy request.

62.     Upon information and belief, Defendant MKLLP did not have a written do-not-

13

call policy while their telemarketers were sending Plaintiff the calls.

63.      Upon information and belief, Defendant MKLLP did not train their employees who engaged in telemarketing on the existence and use of any do-not-call list.

64.      Such conduct violates the TCPA and its implementing regulations, 47 CFR § 64.1200(d)(3) (requiring telemarketers to honor and record DNC requests when made).

65.      Defendant knew or should have known that its conduct would violate the TCPA and its regulations because Defendant MKLLP operates in a highly regulated telephone solicitation industry.

66.      MKLLP knew or should have known the requirements for making TCPA-compliant telemarketing calls and thus knew or should have known that the calls complained of herein violated the TCPA and its regulations.

67.      Defendant knew or should have known the requirements for making TCPA & FTSA compliant telemarketing calls and thus knew or should have known that the unauthorized telemarketing calls and the many disregarded DNC requests complained of herein violated the TCPA & FTSA and both of their regulations.

68.      No emergency necessitated these calls.

## VICARIOUS LIABILITY OF DEFENDANT MKLLP

69.      Defendant MKLLP is vicariously liable for the telemarketing calls that generated the leads on their behalf.

70.      The FCC is tasked with promulgating rules and orders related to the enforcement of the TCPA. 47 U.S.C. § 227(b)(2).

14

71.     The FCC has explained that its "rules generally establish that the party on whose

behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules &*

*Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd.

12391, 12397 ¶ 13

  (1995).

72.     The FCC reiterated that a company on whose behalf a telephone call is made bears

the responsibility for any violations. *In re Rules and Regulations Implementing the*

*Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 565 ¶ 10 (2008)

(recognizing "on behalf of" liability in the context of an autodialed or prerecorded message

call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

73.     The FCC confirmed this principle in a declaratory ruling holding that sellers such as

Post may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its
> telemarketing activities to unsupervised third parties would leave
> consumers in many cases without an effective remedy for
> telemarketing intrusions. This would particularly be so if the
> telemarketers were judgment proof, unidentifiable, or located outside
> the United States, as is often the case. Even where third-party
> telemarketers are identifiable, solvent, and amenable to judgment
> limiting liability to the telemarketer that physically places the call
> would make enforcement in many cases substantially more expensive
> and less efficient, since consumers (or law
>
> enforcement agencies) would be required to sue each marketer
> separately in order to obtain effective relief. As the FTC noted, because
> sellers may have thousands of independent marketers, suing one or a
> few of them is unlikely to make a substantive difference for consumer
> privacy.

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnote

omitted) (alteration marks and internal quotation marks omitted).

**74.**    More specifically, *Dish* held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. *Id.* at 6586 ¶ 34.

**75.**    The ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third- party who placed the telemarketing call. *Id.* at6587 ¶ 36 & n.107.

**76.**    To the contrary, the FCC—armed with extensive data about robocalls and Americans' complaints about them—determined that vicarious liability is essential to serve the TCPA's remedial purpose of protecting Americans from "unwanted telemarketing invasions." *Id.* at 6587

¶ 36.

**77.**    Vicarious liability is important because reputable, traceable, and solvent companies that benefit from illegal telemarketing are "in the best position to monitor and police TCPA compliance by third-party telemarketers." *Id.* at 6588 ¶ 37.

**78.**    Defendant MKLLP is legally responsible for ensuring that the affiliates that make telemarketing calls on its behalf comply with the TCPA when so doing.

**79.**    Defendant MKLLP knowingly and actively attempted to accept business that originated through illegal telemarketing.

**80.**    Defendant MKLLP knew (or reasonably should have known) that their telemarketers were violating the TCPA on their behalf but failed to take effective steps within their power to force the telemarketers to cease that conduct.

**81.**    By hiring a company to make calls on their behalf, Defendant MKLLP "manifest[ed]

assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency ("Restatement").

**82.**  Moreover, Defendant MKLLP maintained interim control over the actions of their telemarketers.

**83.**  For example, Defendant MKLLP had absolute control over whether, and under what circumstances, they would accept a customer from their telemarketers.

**84.**  Furthermore, Defendant MKLLP had day-to-day control over the actions of its telemarketers, including the ability to prohibit them from using an ATDS to contact potential customers of Defendant MKLLP and the ability to require them to respect the National Do Not Call Registry.

**85.**  Defendant MKLLP also gave interim instructions to their telemarketers by providing lead-qualifying instructions and lead volume limits.

**86.**  Defendant MKLLP donned their telemarketers with apparent authority to make the calls at issue. Thus, the telemarketers pitched "Camp Lejeune injury claims" in the abstract.

**87.**  Apparent authority turns on whether a third party believes the principal authorized its agent to act and the belief is "traceable" to a manifestation of the principal. Restatement § 2.03 cmt. c.

**88.**  "[A]pparent authority can arise in multiple ways and does *not* require that 'a principal's manifestation must be directed to a specific third party in a communication made directly to that person.'" *Dish*, 28 FCC Rcd. at 6586 ¶ 34 n.102 (quoting Restatement § 2.03 cmt. c).

**89.**  A principal may make a manifestation "by directing an agent to make statements to third parties or directing or designating an agent to perform acts or conduct negotiations,

17

placing an agent in a position within an organization, or placing an agent in charge of a transaction or situation." Restatement § 2.03 cmt. c.

**90.**     Defendant MKLLP's telemarketers transferred customer information, including Plaintiff's contact information, directly to Defendant MKLLP. Thus, the telemarketer had the "ability . . . to enter consumer information into the seller's sales or customer systems," which the FCC has explained to show apparent agency. *Dish*, 28 FCC Rcd. at 6592 ¶ 46.

**91.**     Finally, the FCC has held that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

**92.**     Defendant MKLLP is the liable party as the direct beneficiary of the illegal telemarketing as they stood to gain Plaintiff as a customer when telemarketers solicited Plaintiff for "Camp Lejeune injury claims" on their behalf.

## INJURY, HARM, DAMAGES, and ACTUAL DAMAGES
## AS A RESULT OF THE CALLS

**93.**     Defendant MKLLP's calls harmed Plaintiff by causing the very harm that Congress sought to prevent—a "nuisance and invasion of privacy."

**94.**     Defendant MKLLP's calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone.

**95.**     Defendant MKLLP's calls harmed Plaintiff by intruding upon Plaintiff's seclusion.

**96.**     Plaintiff has been harmed, injured, and damaged by the calls including, but not limited

to: reduced device storage, reduced data plan usage, anger, frustration, invasion of privacy, and more frequent charging of Plaintiff's cell phone.

## PLAINTIFF'S CELL PHONE IS A RESIDENTIAL NUMBER

97.     The calls were to Plaintiff's cellular phone number 407-577-3881 which is Plaintiff's personal phone that he uses for personal, family, and household use. Plaintiff maintains no landline phones at his residence and has not done so for at least 15 years and primarily relies on cellular phones to communicate with friends and family. Plaintiff also uses his cell phone for navigation purposes, sending and receiving emails, timing food when cooking, and sending and receiving text messages. Plaintiff further has his cell phones registered in his personal name, pays the cell phone from his personal accounts, and the phone is not primarily used for any business purpose.

## CAUSES OF ACTION:

## COUNT ONE:

### (Violation of the TCPA "Sales Call/DNC" Prohibition, 47 U.S.C. 227(c), and 47 C.F.R. § 64.1200(C))

98.     Plaintiff incorporates the preceding paragraphs 1-96 as if fully set forth herein.

99.     Defendant MKLLP's telemarketers called Plaintiff's private residential telephone number which was successfully registered on the National Do-Not-Call Registry more than thirty-one (31) days prior to the calls, for the purposes of commercial solicitation, in violation of 47 U.S.C. § 227(c)(3)(F), and 47 C.F.R. § 64.1200(c)(2).

100.    Plaintiff was statutorily damaged at least thirty-five (35) times under 47 U.S.C. § 227(c)(3)(F) by Defendant MKLLP by the telemarketing calls described above, in the amount of $500.00 per call.

**101.**     Plaintiff was further statutorily damaged because Defendant MKLLP willfully and/ or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount as permitted under U.S.C. § 227(c)(5) for each and every willful and/or knowing violation.

**102.**     Plaintiff is entitled to an award up to $1,500 in damages for each knowing or willful violation of 47 U.S.C. § 227(c)(3)(F).

<u>COUNT TWO:</u>

**Telemarketing Without Mandated Safeguards, 47 C.F.R. § 64.1200(d)**

**(against all Defendants)**

**103.**     Plaintiff incorporates the preceding paragraphs 1-96 as if fully set forth herein.

**104.**     The foregoing acts and omissions of Defendant MKLLP and/or their affiliates or agents constitute multiple violations of FCC regulations by making telemarketing solicitations despite lacking the following:

    a.  A written policy, available upon demand, for maintaining a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(1)[2]

    b.  Training for the individuals involved in the telemarketing on the existence of and use of a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(2)[3]; and,

    c.  In the solicitations, the name of the individual caller and the name of the person or entity on whose behalf the call is being made, in violation of 47 C.F.R. § 64.1200(d)(4).[4]

**105.**     Plaintiff is entitled to an award of at least $500 in damages for each such violation. 47

---

[2] *Seeid.* at 425 (codifying a June 26, 2003 FCC order).
[3] *Seeid.* at 425 (codifying a June 26, 2003 FCC order).
[4] *Seeid.* at 425 (codifying a June 26, 2003 FCC order).

U.S.C. § 227(c)(5)(B).

106.     Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing

or willful violation. 47 U.S.C. § 227(c)(5).

## COUNT THREE

### (Violations of Florida Statutes § 501.059)

107.     Plaintiff incorporates the preceding paragraphs 1-96 as if fully set forth herein.

108.     Defendant MKLLP and/or their affiliates and authorized representatives called

Plaintiff using automated means without Plaintiff's express written consent. Fla. Stat. §

501.059(8)(a).

109.     Defendant MKLLP did not have Plaintiff's prior express written consent when making

the telephonic solicitation calls. Fla. Stat. § 501.059(1)(g).

110.     Plaintiff is entitled to an award of at least $500 in damages for each such violation of

Fla. Stat. § 501.059(8)a) pursuant to Fla. Stat. § 501.059(10)(a)(2).

111.     Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing

or willful violation. Fla. Stat. § 501.059(10)(a)(b).

## COUNT FOUR

### (Violations of Florida TELEMARKETING ACT)

112.     Plaintiff incorporates the preceding paragraphs 1-96 as if fully set forth herein.

113.     Defendant MKLLP called Plaintiff more than three times within a 24-hour period.

Fla. Stat. 501.616(6)(b).

114.     Defendant MKLLP and/or their affiliates and authorized representatives called

Plaintiff using automated dialing equipment that intentionally transmitted false caller

21

identification information.  Fla. Stat. 501.616(7)(b).

**115.** In addition to any other penalties or remedies provided under law, a person who is injured by a violation of the provisions of this part may bring a civil action for recovery of actual damages and/or penalties and/or punitive damages, including costs, court costs, attorney's fees. No provision of this part shall be construed to limit any right or remedy provided under law.  Fla. Stat. 501.625.

**COUNT FIVE**
**(Violations of Texas Business and Commerce Code 302.101)**
**Failure to obtain a Telephone Solicitation Registration Certificate**

**116.** Plaintiff incorporates the preceding paragraphs 1-96 as if fully set forth herein.

**117.** Defendant and/or their affiliates or agents made at least two (2) solicitation sales calls to Plaintiff without having a valid telephone solicitation as required under Tex. Bus. Com. Code 302.

**118.** As a result of Defendant's and/or their affiliates or agents' violations of Tex. Bus. and Com. Code 302.101 Plaintiff may seek damages of up to $5,000 for each violation.  Tex. Bus. and Com. Code 302.302(a).

**119.** As a result of Defendant's and/or their affiliates or agents' violations of Tex. Bus. and Com. Code 302.101 Plaintiff may seek all reasonable costs of prosecuting this action, including court costs, deposition costs, and witness fees.  Tex. Bus. and Com. Code 302.302(d

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Joshua Cacho prays for judgment against Defendant MKLLP as follows:

    A. Leave to amend this Complaint to name additional DOESs as they are

22

identified and to conform to the evidence presented at trial;

B.      A declaration that actions complained of herein by Defendant violates the TCPA and Fla. Stat. 501.059 and Florida Telemarketing Act;

C.      An award of $1500 per call in statutory damages arising from the TCPA 47 U.S.C §227(c) intentional violations jointly and severally against the corporations for 35 calls.

D.      An award of $1500 per call in statutory damages arising from the TCPA 47 U.S.C § 227(c)(5) intentional violations jointly and severally against the corporations for 35 calls.

E.      An award of $1,500 per call in statutory damages arising from Fla. Stat. § 501.059(1)(g) intentional violations, pursuant to Fla. Stat. § 501.059(10)(a)(b) for 33 calls.

F.      An award of $1,500 in statutory damages arising from violations of the Texas Business and Commerce code 305.053 intentional violations jointly and severally against the corporation for two (2) calls.

G.      An award of $50,000 in punitive damages arising from intentional violations of Fla. Stat. 501.616(6)(b).

H.      An award of $50,000 in punitive damages arising from intentional violations of Fla. Stat. 501.616(7)(b).

I.      An award of $5,000 in statutory damages arising from violations of the Texas Business and Commerce code 302.101 intentional violations jointly and severally against the corporation for two (2) calls.

J.      An award to Plaintiff of interest, costs, and attorneys' fees, as allowed by law

and equity.

K.      Such further relief as the Court deems necessary, just, and proper.


## JURY
## DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

August 09, 2023,                        Respectfully


Joshua Cacho
Plaintiff, Pro Se
164 Estella Rd
Lake Mary, Florida 32746
407-577-3823

# EXHIBIT A

8/9/23, 8:58 AM

Case 3:23-cv-00298-KC   Document 1   Filed 08/15/23   Page 26 of 30

Gmail - your Camp Lejeune case: Michael Rivera (deceased) by Alex Rivera (son). Please confirm receipt. Thank you.

 **Gmail**

alex rivera <alexrivera44521@gmail.com>

---

## your Camp Lejeune case: Michael Rivera (deceased) by Alex Rivera (son). Please confirm receipt. Thank you.

1 message

---

**Bill Kelly** <bk@mccarthykelly.com>
To: "Alexrivera44521@gmail.com" <Alexrivera44521@gmail.com>
Cc: "Swett, Sarah" <sswett@motleyrice.com>, Hillarie Stecker <hstecker@motleyrice.com>, Kim Barone Baden <kbarone@motleyrice.com>, Kevin Dean <kdean@motleyrice.com>, Bobby Yao <by@mccarthykelly.com>

Tue, Jul 25, 2023 at 9:57 AM

## Alex:

-

<u>**First**</u>: thank you for requesting our assistance on your Camp Lejeune toxic water claim.  <u>Please confirm receipt of this email</u>.

<u>**Second**</u>: the <u>Motley Rice law firm (cc'd here) will be calling you</u> regarding next steps on your potential case.

<u>**Third (spread the word)**</u>: please forward this email to anyone who was at Camp Lejeune, NC during 1953 to 1987.   Thank you!


<u>**Camp Lejeune claims**</u> The US government estimates that 1,000,000 people (service members, their families and civilians) were exposed to toxic and contaminated water at Camp Lejeune and New River between August 1, 1953 and December 31, 1987 believed to cause cancers, birth defects and other life-altering diseases.  Toxic water at Camp Lejeune has been traced to multiple sources, including a dry-cleaning operation, multiple underground fuel storage tanks believed to have leaked at least a million gallons of fuel and other dangerous toxic chemical dumping.  According to the VA, two wells at the base that were closed in 1985 contained the following toxins: Trichloroethylene (TCE) + Perchloroethylene (PCE) + Benzene + Vinyl chloride + other compounds

<u>If you are one of the 1,000,000 military members and/or family members stationed/lived at Camp Lejeune between 1953 to 1987 and was diagnosed with any illness, diseases or other health effects linked to exposure to unsafe levels of toxins, you are entitled to a substantial financial award</u>.  Unsafe levels of the toxins have been linked to numerous diseases and other health effects including:

- Cancers (all types): Bladder, Breast, Cervical, Esophageal, Kidney, Leukemia, Liver, Lung, Multiple Myeloma, Myelodysplastic Syndromes, Non-Hodgkin's Lymphoma and Ovarian

- Birth Defects

- Cardiac Effects

- Female Infertility and Miscarriages

- Hepatic Steatosis (liver disease)

- Neurobehavioral Effects

- Parkinson's Disease

- Renal Toxicity (kidney injury or disease)

- Scleroderma

 Gmail

**alex rivera <alexrivera44521@gmail.com>**

## (no subject)
1 message

**Bill Kelly** <bk@mccarthykelly.com>                                          Tue, Jul 25, 2023 at 9:58 AM
To: "Alexrivera44521@gmail.com" <Alexrivera44521@gmail.com>

William P. Kelly

McCarthy | Kelly LLP

52 Duane Street

New York, NY 10007

(T) 212.732.5040

(F) 212.732.6323

(C) 917.273.2714

www.mccarthykelly.com

  

8/9/23, 8:58 AM

Case 3:23-cv-00298-KC  Document 1  Filed 08/15/23  Page 28 of 30

Gmail - Potential Contaminated Water at Camp LeJeune Claim – Michael Rivera (dec.) MRID#1010356.000

 **Gmail**

alex rivera <alexrivera44521@gmail.com>

---

## Potential Contaminated Water at Camp LeJeune Claim – Michael Rivera (dec.) MRID#1010356.000
1 message

---

**Motley Rice LLC via DocuSign** <dse_na2@docusign.net>
Reply-To: Motley Rice LLC <correspondence@motleyrice.com>
To: "Rivera, Alex" <Alexrivera44521@gmail.com>

Tue, Jul 25, 2023 at 1:00 PM

---





Motley Rice LLC sent you a document to review and sign.



**Motley Rice LLC**
correspondence@motleyrice.com

Dear Mr. Alex Rivera,

Thank you for contacting us regarding exposure to contaminated water at Camp LeJeune, NC. McCarthy Kelly LLP, together with Motley Rice LLC will be working as co-counsel on your potential case. We look forward to evaluating a potential claim on behalf of your father. If you want to pursue this possible claim, we will need you to sign the enclosed Contract of Representation.

Please provide us with a with a copy of the death certificate and a certified copy of the appointment papers or court order of appointment, if available.

Once you have retained us, the first course of action is to document his exposure to the contaminated water at Camp LeJeune via service records or a DD214 and document a related illness with medical records obtained from the facilities in which he was treated. If you have saved any records related to his diagnosis and/or treatment in your possession, please provide them.

DocuSign Envelope ID: 2665F69F-6607-46F8-94AF-25F461489E61

**Motley Rice LLC**
## CONTRACT OF INVESTIGATION AND REPRESENTATION

I employ and retain the law firms of Motley Rice LLC (hereinafter "MR") and McCarthy Kelly LLP (hereinafter "MKLLP") to represent me as set forth herein.

1. <u>SCOPE OF REPRESENTATION</u>

MR and MKLLP agree to investigate and evaluate my potential claim(s) against the United States Government in connection with injuries from exposure to contaminated water at Camp Lejeune, North Carolina ("my Claim").

After investigating my Claim, MR and MKLLP shall have the right to withdraw and cancel this Contract if it is unable or unwilling to undertake the contemplated representation. Thereafter, if MR and MKLLP agrees to pursue this claim after investigation and evaluation, I employ and retain MR and MKLLP to represent my interests in any and all actions, claims or trial proceedings related to my Claim.

This Contract does not cover any matters either for me, any member of my family, or any other person or entity except as specifically set forth above. The scope of MR and MKLLP's representation of me does not include the filing of any claim for medical malpractice, workers compensation coverage, veteran's benefits, or other state or federal employee benefits. The scope of MR and MKLLP's representation also does not cover the filing of any appeal, if an appeal is taken of any judgment obtained.

If my Claim will include an attempt to recover damages based on the death of an individual caused by care or services rendered by the proposed defendants, I acknowledge that MR and MKLLP are representing the estate of the deceased only for purposes of pursuing the survival and wrongful death claims and is not assuming any responsibility for advising me in my capacity as personal representative or fiduciary of the estate.

2. <u>AUTHORITY OF MR and MKLLP</u>

I empower MR and MKLLP to take all steps in this matter deemed by them to be advisable for the investigation and handling of my Claim, including hiring investigators, expert witnesses and/or other attorneys and filing any legal action necessary. During the term of representation, MR and MKLLP are authorized and empowered to vote on my behalf in any bankruptcy proceeding or consolidation relevant to the scope of this representation. In addition, MR and MKLLP are authorized and empowered to deposit checks made payable to the undersigned in its South Carolina trust account in order to disburse the settlement proceeds according to the terms of this representation.

3. <u>ATTORNEYS' FEES</u>

THE CLIENT OWES NO MONEY UNLESS RECOVERY IS MADE.

It is understood and agreed that I am employing MR and MKLLP as set forth herein, and that *in the event no recovery is made, I will not owe MR and MKLLP for any sums whatsoever as attorneys' fees except as specifically provided herein.* I further understand that should MR and MKLLP recommend settlement of a case that I elect to proceed to trial, if no money damages are recovered from the trial, MR and MKLLP will have the right to collect reasonable expenses from me incurred in this litigation.

8/9/23, 9:00 AM
Gmail - Potential Contaminated Water at Camp LeJeune Claim – Michael Rivera (dec.) MRID#1010356.000

 Gmail

alex rivera <alexrivera44521@gmail.com>

## Potential Contaminated Water at Camp LeJeune Claim – Michael Rivera (dec.) MRID#1010356.000
1 message

**Motley Rice LLC via DocuSign** <dse_na2@docusign.net>
Reply-To: Motley Rice LLC <correspondence@motleyrice.com>
To: "Rivera, Alex" <Alexrivera44521@gmail.com>

Sat, Jul 29, 2023 at 12:19 PM





Motley Rice LLC sent you a document to review and sign.



**Motley Rice LLC**
correspondence@motleyrice.com

Dear Mr. Alex Rivera,

Thank you for contacting us regarding exposure to contaminated water at Camp LeJeune, NC. McCarthy Kelly LLP, together with Motley Rice LLC will be working as co-counsel on your potential case. We look forward to evaluating a potential claim on behalf of your father. If you want to pursue this possible claim, we will need you to sign the enclosed Contract of Representation.

Please provide us with a with a copy of the death certificate and a certified copy of the appointment papers or court order of appointment, if available.

Once you have retained us, the first course of action is to document his exposure to the contaminated water at Camp LeJeune via service records or a DD214 and document a related illness with medical records obtained from the facilities in which he was treated. If you have saved any records related to his diagnosis and/or treatment in your possession, please provide them.